[Civ. No. 25416. Fourth Dist., Div. Two. Dec. 21, 1982.]

E. L. WHITE, INC., et al., Plaintiffs and Appellants, v.
CITY OF HUNTINGTON BEACH, Defendant and Appellant.

CALIFORNIA INSURANCE GUARANTEE ASSOCIATION,
Plaintiff and Respondent, v.
ROYAL GLOBE INSURANCE COMPANY et al.,
Defendants and Appellants.

COUNSEL

Harrington, Foxx, Dubrow & Canter and Peter Abrahams for Plaintiffs and Appellants and Defendants and Appellants.

Kinkle, Rodiger & Spriggs and Michael J. Logan for Defendant and Appellant City.

Clausen, Harris & Campbell and Kenneth H. Clausen for Plaintiff and Respondent.

OPINION

MORRIS, P. J.—E. L. White, Inc. and the City of Huntington Beach were unsuccessful codefendants in two lawsuits, a wrongful death action and a personal injury action, both of which arose from the same accident. After paying half of the judgments in both cases, Royal Globe Insurance Companies (White's insurer) and White filed suit against Huntington Beach for indemnity. Prior to trial on the indemnity action, however, Huntington Beach's excess insurer (Reserve Insurance Company), who would have been responsible for paying the approximately $140,000 sought by Royal Globe and White as indemnity for their portion of the wrongful death judgment, became insolvent. The California Insurance Guarantee Association (CIGA), which is statutorily required to pay some obligations of insolvent insurers, then filed suit against Royal Globe and White for declaratory and injunctive relief, claiming that Royal Globe and White could not proceed with their indemnity action against Huntington Beach.[1] After consolidation of the two actions, the trial court awarded total indemnity of approximately $6,000 to Royal Globe and White for their portion of the personal injury judgment, which amount was still within the limits of Huntington Beach's policy with its primary, and solvent, insurer. However, the court enjoined Royal Globe from obtaining a judgment of indemnity against Huntington Beach in excess of that $6,000.

Two appeals have resulted. Royal Globe and White have both appealed, and claim that they should be indemnified for the wrongful death judgment as well as the personal injury judgment. They also ask for interest from the date they made payments in satisfaction of those judgments. Huntington Beach has also appealed, and claims that Royal Globe and White are not entitled to total in-

---

[1]Prior to Reserve's insolvency and CIGA's suit, Huntington Beach successfully demurred to the complaint of Royal Globe and White. However, the subsequent judgment of dismissal was reversed in *E. L. White, Inc.* v. *City of Huntington Beach* (1978) 21 Cal.3d 497 [146 Cal.Rptr. 614, 579 P.2d 505].

demnity. We believe that Royal Globe and White are entitled to prejudgment interest. Otherwise, we affirm.

### CIGA AND THE SUBROGATED INSURER CLAIMANT

Because Royal Globe has paid White's share of the personal injury and wrongful death judgments, Royal Globe's position in this indemnity action is one of a subrogee. Additionally, because its excess insurer is insolvent, Huntington Beach has no insurance coverage for any further payments it might have to make in the wrongful death action. Thus, if Royal Globe obtains a judgment of indemnity against Huntington Beach for the wrongful death action, one of two things will occur—either CIGA will assume the obligation of Huntington Beach's insolvent insurer and pay Royal Globe; or Huntington Beach will be forced to pay the judgment. CIGA and Huntington Beach claim that the former is expressly prohibited by statute and the latter is contrary to the primary purpose of the legislation that created CIGA. We agree and also reject the contention that denying Royal Globe indemnity will result in an unconstitutional denial of equal protection.

CIGA was established by the Legislature in 1969 to provide each member insurer with "insurance against loss arising from the [member's] failure . . . [as] an insolvent insurer to discharge its obligations under its insurance policies." (Ins. Code, §§ 1063, subd. (a), 119.5.)[2] CIGA's membership includes numerous types of insurers admitted to transact insurance in California. Their authority to transact insurance is dependent upon their membership in CIGA. (§ 1063, subd. (a).) Membership responsibilities include making premium payments to CIGA when another insurer becomes insolvent. CIGA is then required to pay the obligations of that insolvent insurer. (§ 1063.5.) However, while CIGA does provide insurer insolvency insurance, it "does not 'stand in the shoes' of the insolvent insurer for all purposes." (*Biggs* v. *California Ins. Guarantee Assn.* (1981) 126 Cal.App.3d 641, 645 [179 Cal.Rptr. 16].) Royal Globe is a member of CIGA.

In the present case, CIGA is expressly forbidden from standing in the shoes of Reserve, Huntington Beach's insolvent excess insurer, for the purpose of making payments to Royal Globe. CIGA is only authorized to pay the "covered claims" of an insolvent insurer. (§ 1063.2, subd. (a).) But, "covered claims" do not include "any obligations to insurers, insurance pools, or underwriting associations . . ." (§ 1063.1, subd. (c)(4)), nor do they include "any claim by any person other than the original claimant under the insurance policy in his own name . . . [or] any claim asserted by an assignee or one claiming by right of subrogation . . . ." (§ 1063.1, subd. (c)(7)(b).) Because Royal Globe

---

[2]All statutory references are to the Insurance Code unless otherwise stated.

is an insurer and because its claim is by right of subrogation, it may not seek payment from CIGA. Such is the clear and unambiguous language of the statute.

White and Royal Globe contend, however, that regardless of whether Royal Globe's claim is a "covered claim," there is nothing in the CIGA legislation that prevents them from obtaining a judgment of indemnity against Huntington Beach. The "covered claim" question, they argue, is an issue solely between Huntington Beach and CIGA. This argument is unpersuasive.

If Huntington Beach was required to indemnify Royal Globe for the wrongful death judgment and CIGA assumed Reserve's insurance obligation to Huntington Beach, the result would be the same as if CIGA made direct payment to Royal Globe, an action expressly proscribed by section 1063.1. The fact that the payment would go from CIGA to a subrogated insurer through the conduit of an insured of an insolvent insurer does not sanitize the transaction. Such is merely an artifice aimed at circumventing the clear command of the Legislature.

On the other hand, if CIGA did not pay Huntington Beach after it had been ordered to indemnify Royal Globe, Huntington Beach would be forced to satisfy the judgment from its own assets. This is equally objectionable, because the overriding purpose of the Legislature in creating CIGA was to protect just such a party as Huntington Beach, the insured of an insolvent insurer.

Allowing Royal Globe to recover in this case, whether the judgment ultimately be satisfied by CIGA or by Huntington Beach, would undermine the CIGA system. We fully agree with the conclusion that "[t]he Legislature chose to provide a limited form of protection for the public, not a fund for the protection of other insurance companies from the insolvencies of fellow members." (*California Union Ins. Co.* v. *Central National Ins. Co.* (1981) 117 Cal.App.3d 729, 734 [173 Cal.Rptr. 35]; see also *Interstate Fire & Casualty Ins. Co.* v. *California Ins. Guarantee Assn.* (1981) 125 Cal.App.3d 904, 909-910 [178 Cal.Rptr. 673].) Indeed, this view has recently been adopted by the California Supreme Court. (*Reserve Insurance Co.* v. *Pisciotta* (1982) 30 Cal.3d 800, 814, fn. 7 [180 Cal.Rptr. 628, 640 P.2d 764].) Support for this conclusion is found in an often-cited article written by the then California Insurance Commissioner shortly after the enactment of the CIGA legislation. "The creation of the California Insurance Guarantee Association provides the *insured public* of the State of California with an additional protection by which those persons injured now have the assurance that their claims will be paid, notwithstanding the fact that their claims may be against an insolvent company. Granted, the record in California of insolvencies is exemplary, but this record should not deter the State from protecting even a minute segment of *the public* from losses occa-

sioned by insurance company insolvencies." (Barger, *California Insurance Guarantee Association* (1970) 45 State Bar J. 475, 482, italics added.)

White and Royal Globe make much of the fact that the CIGA legislation does not *expressly* prohibit all lawsuits by subrogated insurers against insureds of insolvent insurers. Additionally, they note that a part of the legislation dealing with automobile insurance claims *does* expressly limit an insurer's right to sue the insured of an insolvent insurer.[3] If all subrogated insurer lawsuits are in fact prohibited, it is argued, then it was pointless for the Legislature to specifically proscribe one particular class of such suits; therefore, the Legislature only intended to bar a subrogated insurer from suing the insured of an insolvent insurer when it expressly so stated. We disagree. Although the statutory language cited by White and Royal Globe may be technically unnecessary in light of our interpretation of the CIGA legislation as a whole, the existence of this language is not sufficient to overcome the result which the Legislature clearly intended in this case. Instead, we view this language as reinforcing the Legislature's intent that protection be afforded to insureds of insolvent insurers rather than to other insurance companies.

White and Royal Globe's only case authority is a Louisiana Court of Appeal case (*Hickerson* v. *Protective Nat. Ins. Co., etc.* (La.App. 1979) 375 So.2d 969), which was subsequently disregarded by another Louisiana Circuit Court of Appeal (*Billeaudeau* v. *Lemoine* (La.App. 1979) 377 So.2d 1344, 1347) and reversed, although on another ground, by the Louisiana Supreme Court (*Hickerson* v. *Protective Nat. Ins. Co.* (La. 1980) 383 So.2d 377). We disagree with the reasoning set forth by the Court of Appeal in *Hickerson* and choose not to adopt it.

■ Finally, we are unpersuaded that denying Royal Globe indemnity from Huntington Beach will result in a violation of equal protection. (See also *In-*

---

[3]The Insurance Code sections that preclude Royal Globe from collecting from CIGA in the present case provide that " '[c]overed claims' shall not include any obligations to insurers," (§ 1063.1, subd. (4)) and ". . . any claim . . . by . . . one claiming by right of subrogation, *except as otherwise provided in this chapter.*" (*Id.,* subd. (7), italics added.) The section cited by White and Royal Globe is an example of where the Legislature has "otherwise provided."

Section 1063.2, subdivision (c)(1) provides in part: "A member insurer may recover in subrogation from the association only one-half of any amount paid by such insurer under uninsured motorist coverage for bodily injury or wrongful death (and nothing for a payment for anything else), in those cases where the injured person insured by such an insurer has proceeded under his uninsured motorist coverage on the ground that the tortfeasor is uninsured as a result of the insolvency of his liability insurer . . . , provided that *such member insurer shall waive all rights of subrogation against such tortfeasor.*" (Italics added.)

Section 1063.2, subdivision (c)(2) provides: "Any claimant having collision coverage on a loss which is covered by the insolvent company's liability policy shall first proceed against his collision carrier. *Neither that claimant nor the collision carrier, if it is a member of the association, shall have the right to sue or continue a suit against the insured of the insolvent insurance company for such collision damage.*" (Italics added.)

*terstate Fire & Casualty Ins. Co.* v. *California Ins. Guarantee Assn., supra,* 125 Cal.App.3d 904, 909-910; *California Union Ins. Co.* v. *Central National Ins. Co., supra,* 117 Cal.App.3d 729, 734.) No contention is made that any but the most deferential standard applies to our review of the CIGA legislation. Thus, the most recent explication of that standard by the United States Supreme Court is pertinent: "The Equal Protection Clause directs that 'all persons similarly circumstanced shall be treated alike.' [Citation.] But so too, 'The Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same.' [Citation.] The initial discretion to determine what is 'different' and what is 'the same' resides in the legislatures of the States. A legislature must have substantial latitude to establish classifications that roughly approximate the nature of the problem perceived, that accommodate competing concerns both public and private, and that account for limitations on the practical ability of the State to remedy every ill. In applying the Equal Protection Clause to most forms of state action, we thus seek only the assurance that the classification at issue bears some fair relationship to a legitimate public purpose." (*Plyler* v. *Doe* (1982) 457 U.S. 202, 216 [72 L.Ed.2d 786, 798-799, 102 S.Ct. 2382, 2394].)

The purpose of the CIGA statutory scheme is to protect buyers of insurance from insolvencies of insurance companies. It cannot be argued seriously that this is not a legitimate public purpose. However, White and Royal Globe do contend that prohibiting all subrogation actions against insureds of insolvent insurers creates an impermissible classification.

To the extent that the CIGA legislation discriminates between subrogation plaintiffs with claims against insureds of insolvent insurers and subrogation plaintiffs with claims against insureds of solvent insurers or against those who are uninsured, the classification certainly has a fair relationship to the statutory purpose. If such a classification were not made, there would be situations where the person meant to be protected by the CIGA legislation would be left vulnerable just because his insurer had become insolvent. The fact that the Legislature may have been able to attain the same legitimate goal through other means does not compel a different result. The decision that subrogees, rather than CIGA or insureds, should bear the risk of insurer insolvencies is not a violation of equal protection. Such a choice is one within the Legislature's "substantial latitude to establish classifications that roughly approximate the nature of the problem perceived." (*Plyler* v. *Doe, supra* 457 U.S. at p. 216 [72 L.Ed.2d at pp. 798-799].)

TOTAL INDEMNITY

██ White and Royal Globe were awarded total indemnity of approximately $6,000 for the personal injury judgment and, were it not for the insolvency of

the excess insurer, they undoubtedly would have also received total indemnity for the wrongful death judgment. Huntington Beach claims that the trial court erred in not apportioning fault between itself and White, the codefendants in the personal injury and wrongful death actions.

The pertinent facts are set forth in the earlier Supreme Court opinion in this case (see fn. 1, *ante*):

"City [Huntington Beach] entered into a contract with White for the construction of certain public improvements which included a deep storm drain. The contract contained [a general indemnity clause requiring White to indemnify City for all damages arising out of the project]. . . . [¶] White subcontracted with the firm of Barnett and Thomas (B & T) for the storm drain portion of the work, which apparently required the cutting of a sewer line to allow the installation of the storm drain which passed beneath and at right angles to the sewer line. The work was completed and the necessary excavation filled, but some five months later the sewer system began to malfunction in the area where the sewer line had been cut to allow for installation of the storm drain. City, which had previously accepted the work as completed, contacted White and B & T and arranged to have the latter make repairs, the understanding being that if the malfunction were found to be the result of faulty work previously done by B & T the repairs would be at no cost to City.

"In order to reach the sewer line it was necessary that a 14-foot trench be dug. This was done, but apparently the walls of the trench were neither shored nor sloped in compliance with applicable California construction safety orders. Nevertheless two B & T employees, Ellett and Butcher, descended into the trench to perform the necessary inspection and work. While they were so engaged City's chief construction inspector and its chief construction engineer visited the site several times, and although they noticed the indicated safety order violation they took no action to compel compliance before the work continued. Later the same day, while Ellett and Butcher were continuing their work in the trench, one of its walls collapsed upon them. Ellett was killed, and Butcher was injured.

". . . . . . . . . . . . . . . . . . . . .

"Before the [wrongful death and personal injury] actions went to trial City and its liability carrier had filed a separate action against White and its liability carrier, B & T and others, seeking, [inter alia, declaratory relief]. . . . The action proceeded to trial and a judgment resulted in favor of White and its carrier, the trial court finding that City had been actively negligent and concluding that therefore indemnity under the general indemnity clause of the construction con-

tract was precluded. [Citation.] The judgment was affirmed on appeal." (*E.L. White, Inc.* v. *City of Huntington Beach, supra,* 21 Cal.3d 497, 502-503.)

In reversing the judgment of dismissal following the sustaining of Huntington Beach's demurrer in this case, the Supreme Court held that the general indemnity clause in the contract between White and Huntington Beach did not preclude White and Royal Globe from obtaining indemnity from Huntington Beach. The court concluded, "Accordingly, the principles of implied equitable indemnity must be held to have come into play. The specific application of those principles to the facts herein is a matter to be determined at trial in accordance with the evidence presented to the court. This determination, we hold, is to be conducted in light of the teaching set forth in our recent decision in *American Motorcycle Assn.* v. *Superior Court* (1980) 20 Cal.3d 578 [143 Cal.Rptr. 692, 574 P.2d 763]." (*E. L. White, Inc.* v. *City of Huntington Beach, supra,* 21 Cal.3d at p. 510.) The trial court's determination has now been made and is before us for review. We conclude that the trial court did not err in requiring Huntington Beach to fully indemnify White and Royal Globe.

Huntington Beach appears to suggest that there can never be full equitable indemnity after *American Motorcycle.* We disagree. In *American Motorcycle,* the Supreme Court held that a concurrent tortfeasor may "obtain partial indemnity from other concurrent tortfeasors on a comparative fault basis." (20 Cal.3d 578, 598.) However, the court only stated that the all-or-nothing equitable indemnity doctrine was being *modified* to allow partial indemnity *in appropriate cases.* (*Id.,* at p. 583; see also *People* ex rel. *Dept. of Transportation* v. *Superior Court* (1980) 26 Cal.3d 744, 756-757 [163 Cal.Rptr. 585, 608 P.2d 673].) Additionally, one of the New York high court cases upon which our Supreme Court relied in modifying the equitable indemnity doctrine was quoted as stating, " 'There are situations when the facts would in fairness warrant what [the named defendant] here seeks—passing on to [a concurrent tortfeasor] all responsibility that may be imposed on [the named defendant] for negligence, a traditional full indemnification.' " (*American Motorcycle Assn.* v. *Superior Court, supra,* 20 Cal.3d at p. 597, quoting *Dole* v. *Dow Chemical Company* (1972) 30 N.Y.2d 143 [331 N.Y.S.2d 382, 386, 282 N.E.2d 288, 53 A.L.R.3d 175].) Indeed, the New York high court has, since *Dole,* expressly held that the common law principles of full indemnity have not been abrogated. (*D'Ambrosio* v. *City of New York* (1982) 55 N.Y.2d 454 [450 N.Y.S.2d 149, 152, 435 N.E.2d 366]; *Kelly* v. *Diesel Const. Div. of Carl A. Morse* (1974) 35 N.Y.2d 1 [358 N.Y.S.2d 685, 688, 315 N.E.2d 751]; *Rogers* v. *Dorchester Associates* (1973) 32 N.Y.2d 553, 565-566 [347 N.Y.S.2d 22, 31-32, 300 N.E.2d 403, 64 A.L.R.3d 993].)

The New York court has stated that "where one is held liable solely on account of the negligence of another, indemnification, not contribution, principles

apply to shift the entire liability to the one who was negligent." (*D'Ambrosio* v. *City of New York, supra,* 450 N.Y.S.2d at p. 152; see also *Robinson* v. *Shapiro* (2d Cir. 1981) 646 F.2d 734, 739-741.) We conclude, as they have in New York, that a vicariously liable tortfeasor may still obtain full indemnity even though *American Motorcycle* now allows partial indemnity to be obtained on a comparative fault basis in appropriate cases. Thus, because the trial court as trier of fact in this case has concluded that White is entitled to full indemnity, the issue is whether there is substantial evidence to support that conclusion.

There is substantial evidence that White was liable only vicariously and that Huntington Beach was actually negligent. It is undisputed that White, unlike Huntington Beach, had no personnel at the accident site. The trier of fact could therefore reasonably find that White was held liable based solely upon the peculiar risk doctrine, which imposes vicarious liability on the employer of an independent contractor for the independent contractor's negligence.[4] In addition, Huntington Beach has previously been found actively negligent in the trench accident, a fact that Huntington Beach is collaterally estopped from disputing. (*E. L. White, Inc.* v. *City of Huntington Beach, supra,* 21 Cal.3d 497, 510.) Because Huntington Beach was actually negligent and White was only vicariously liable, (cf. *City of Sacramento* v. *Gemsch Investment Co.* (1981) 115 Cal.App.3d 869 [171 Cal.Rptr. 764]) White was entitled to full indemnity. (See *Rossmoor Sanitation, Inc.* v. *Pylon, Inc.* (1975) 13 Cal.3d 622 [119 Cal.Rptr. 449, 532 P.2d 97].) To conclude otherwise would counter basic "principles of common-law indemnification between vicariously liable tortfeasors and tortfeasors guilty of the acts and omissions causing the harm. In short, the apportionment rule applies to those who in fact share responsibility for causing the accident or harm, and does not extend further to those who are only vicariously liable . . . ." (*Rogers* v. *Dorchester Associates, supra,* 32 N.Y.2d 553, 566 [347 N.Y.S.2d 22, 32].)[5]

Huntington Beach also contends that White had an absolute duty to perform inspections at the trench site. This is based on the assertion that the duties of Huntington Beach, as the jury was instructed in the wrongful death and per-

---

[4]In *Castro* v. *State of California* (1981) 114 Cal.App.3d 503, 510 [170 Cal.Rptr. 734], this court recognized that California has adopted the peculiar risk doctrine as expressed in sections 413 and 416 of the Restatement Second of Torts. (See also *Aceves* v. *Regal Pale Brewing Co.* (1979) 24 Cal.3d 502, 508 [156 Cal.Rptr. 41, 595 P.2d 619]; *Griesel* v. *Dart Industries, Inc.* (1979) 23 Cal.3d 578, 585 [153 Cal.Rptr. 213, 591 P.2d 503].) As stated in section 416, the doctrine is as follows: "One who employs an independent contractor to do work which the employer should recognize as likely to create during its progress a peculiar risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by the failure of the contractor to exercise reasonable care to take such precautions, even though the employer has provided for such precautions in the contract or otherwise."

[5]We do not deem it significant, as, apparently, Huntington Beach does, that White's vicarious liability arose from the negligence of B & T, the subcontractor, and not of Huntington Beach. The parties have not disclosed why B & T is not a party to the indemnity action.

sonal injury actions, were "virtually the same" as the duties of White. No authority is cited to support this view. Moreover, the jury instructions relied upon did not impose an absolute duty of inspection on either White or Huntington Beach.

Because there is substantial evidence to support the findings that Huntington Beach was negligent and that White was only vicariously liable, we affirm the judgment awarding full indemnity to White.

PREJUDGMENT INTEREST

White and Royal Globe were awarded full indemnity from Huntington Beach for the personal injury action plus interest, but only from the date the indemnity judgment was entered. They claim that they are entitled to prejudgment interest, from the date they made payment in satisfaction of the personal injury judgment. We agree.

Civil Code section 3287, subdivision (a) provides in part: "Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day . . . ." Prejudgment interest must be granted as a matter of right if damages are certain or ascertainable, and the interest runs from the date when the damages are certain or ascertainable and when the sum due is made known to the defendant. (*Levy-Zentner Co.* v. *Southern Pac. Transportation Co.* (1977) 74 Cal.App.3d 762, 798 [142 Cal.Rptr. 1]; see also *Tripp* v. *Swoap* (1976) 17 Cal.3d 671, 681-682 [131 Cal.Rptr. 789, 552 P.2d 749] (overruled on other grounds, 31 Cal.3d 166 [181 Cal.Rptr. 893, 643 P.2d 476].)

In the present case, White and Royal Globe's damages were certain when they satisfied the judgments in the personal injury and wrongful death actions. Huntington Beach was aware of the exact amount paid because it paid the other half of the judgments.

Huntington Beach claims that the damages were not certain or ascertainable until judgment was entered in this indemnity action, because the amount of White and Royal Globe's recovery was uncertain until the trial court made its determination of comparative fault under the principles set forth in *American Motorcycle*. This argument is not convincing.

Although we have found no cases directly on point, we conclude that the present situation is analogous to similar cases in which prejudgment interest has been allowed. In *Hansen* v. *Covell* (1933) 218 Cal. 622 [24 P.2d 772, 89 A.L.R. 670], the Supreme Court held that a plaintiff was entitled to prejudg-

ment interest even though the plaintiff's certain and liquidated claim under a contract was reduced by a defendant's unliquidated set-off or counterclaim. (*Id.*, at pp. 629-631; cf. *Bentz Plumbing & Heating* v. *Favaloro* (1982) 128 Cal.App.3d 145, 152 [180 Cal.Rptr. 223]; *Leaf* v. *Phil Rauch, Inc.* (1975) 47 Cal.App.3d 371, 375-376 [120 Cal.Rptr. 749]; see also Annot. (1934) 89 A.L.R. 678.) Similarly, in *Coleman Engineering Co.* v. *North American Aviation, Inc.* (1966) 65 Cal.2d 396 [55 Cal.Rptr. 1, 420 P.2d 713], the Supreme Court allowed prejudgment interest even though the amount of damages claimed was more than the amount awarded (*id.*, at pp. 408-409; see also *Overland Machine Products, Inc.* v. *Swingline, Inc.* (1968) 263 Cal.App.2d 642, 649-650 [36 Cal.Rptr. 330]) and even though the damages had been reduced through plaintiff's mitigation efforts (*Coleman Engineering Co., supra,* at p. 409). Here, White and Royal Globe's claim for indemnity was certain in amount from the date the underlying judgments were satisfied, but was subject to a possible reduction if White was found to have been more than vicariously liable. The possibility of that reduction, or even an actual reduction, does not render White and Royal Globe's damages any less certain.

The judgment is modified to allow interest from the date that White and Royal Globe paid their portion of the personal injury judgment, and, as modified, the judgment is affirmed.

McDaniel, J., and Trotter, J., concurred.

The petition of appellants E. L. White, Inc., and Royal Globe Insurance Company for a hearing by the Supreme Court was denied February 16, 1983.